JOHN F. ELWELL v. JOHN G. LUND.[1]

July 26, 1907.

Nos. 15,263, 15,264—(130, 131).

**Usury—Question for Jury.**

In an action to recover the possession of certain merchandise, the defendant claimed to be the owner thereof, and the plaintiff claimed that the defendant was holding the goods as security for an usurious debt. *Held*, on the appeal of the defendant, that the evidence justified the court in submitting the question of usury to the jury and was sufficient to sustain the verdict in favor of the plaintiff.

**Reduction of Verdict.**

On the appeal of the plaintiff, it is *held* that the court was justified in reducing the amount of the verdict.

[1] Reported in 112 N. W. 1009, 1067.

Action in the district court for Hennepin county to recover possession of certain merchandise. The case was tried before Dickinson, J., and a jury which found a verdict for plaintiff in the sum of $20,000. From an order denying an alternative motion for judgment notwithstanding the verdict or for a new trial, defendant Lund appealed. From an order granting a new trial unless plaintiff consented to a reduction of the verdict to $9,625, plaintiff appealed. Affirmed on both appeals.

*C. S. Dever, Wm. H. Hallam,* and *F. H. Boardman,* for plaintiff.

*Jesse Van Valkenburg, Geo. W. Armstrong, John Lind & A. Ueland,* for defendant.

ELLIOTT, J.

This action was brought by John F. Elwell against John G. Lund and Charles H. Wagner to recover possession of certain merchandise alleged to have been wrongfully withheld from the plaintiff, who was the true owner thereof. The case was dismissed as to Wagner, and a verdict was rendered against Lund for the sum of $20,000, which was reduced by the trial court to $9,625. The defendant Lund appealed from an order denying his motion for judgment notwithstanding the verdict or for a new trial, and the plaintiff, Elwell, appealed from that part of the order reducing the amount of the verdict. The two appeals were argued and submitted together.

The record is quite voluminous. There is, however, but little, if any, controversy as to what was done by the parties, although there is an issue as to what was said in certain conversations and as to the nature of the transactions between Elwell and Lund.

The plaintiff, Elwell, was interested in a corporation which conducted the "New Store" in Minneapolis, until it was adjudged a bankrupt on October 13, 1905. The trustees in bankruptcy continued a sale of the bankrupt stock until January 13, 1906. On February 2, 1906, the remainder of the stock and some other assets were sold by the trustees in bankruptcy to Roth Bros. of West Superior, for $63,500. On the following day Elwell and one Evans, who had also been interested in the New Store prior to the bankruptcy, applied to Roth Bros. to purchase the stock. T. J. Roth, who represented the firm, offered to sell the stock for $83,500, of which $63,500 was to be in cash and $20,000

in notes. An option for a few days was given Elwell and Evans, and they made unsuccessful efforts to raise the money. February 8 Roth Bros. commenced selling the stock, and continued to sell at retail until February 19, when the property was delivered under the bill of sale hereinafter referred to. In the course of their efforts to raise the money Elwell and Evans were referred to John G. Lund, to whom they applied for a loan of $50,000 for thirty days, and for the use of which money they offered to pay the sum of $10,000 as a bonus. Up to the time of the interview with Lund there is no controversy as to the facts. Both Elwell and Evans testified that they applied to Lund for a loan of money. Lund, on the other hand, testified that they proposed that he should buy the goods and that they would pay $20,000 toward the purchase price for the privilege of repurchasing the goods at the end of thirty days for the amount invested by Lund and an additional $10,000.

The sole issue in the case is as to whether or not the transaction was a loan or a sale. The jury found that it was a loan, notwithstanding the fact that certain writings executed by the parties purport a sale from Roth Bros. to Lund with an agreement on the part of Lund to resell to Elwell within thirty days upon certain terms designated in the writing. The defendant claims that these writings express the actual agreement and contract between the parties. The plaintiff contends that the actual transaction is not represented by the writings, and that the transaction took the particular form described in the writings for the purpose of evading the usury laws of the state and to enable Lund to receive the $10,000 bonus; and this view was accepted by the jury and the trial court as correct. There is evidence tending to show that the transaction was a loan of money, and that the property was conveyed to Lund as security.

Usury is a fact, to be proven as facts are proven in other civil actions. All that is required is a fair preponderance of the evidence to establish the fact. There is no device or shift on the part of the lender to evade the statute under or behind which the law will not look in order to ascertain the real character of the transaction. Phelps v. Montgomery, 60 Minn. 303, 62 N. W. 260; Lukens v. Hazlett, 37 Minn. 441, 35 N. W. 265.

As the defendant states, there are but two questions presented for the consideration of the court: (1) Can usury be predicated upon the writing described as Exhibit B? (2) If the contract was in fact usurious, was Elwell's conduct such as to estop him from exercising his right to avoid the contract as made? If the writing, Exhibit B, represented the actual agreement between the parties, made in good faith with no purpose to evade the usury laws, it must be conceded that the transaction was a sale, or at least a joint venture, and not subject to attack; but we cannot agree with the learned counsel that this question must be determined from a consideration of the writings alone. If this were true, the usury laws might as well be repealed, as it would be a very simple matter for counsel to draw contracts and arrange papers which in form would be regular, and thus render the transaction impervious to attack, although as a matter of fact the writings represented the ostensible, and not the actual, transaction between the parties. In order to determine whether these writings represent the actual arrangement, it is necessary to consider the surrounding circumstances and the conditions under which the writing was drawn and executed as well as the conduct of the parties prior to, at the time of, and subsequent to its execution.

But a small portion of the evidence can be noted. Elwell and Evans were interested in obtaining this property for their own benefit. Roth Bros. were willing to sell it upon certain conditions. Elwell and Evans attempted to comply with these conditions, and were brought into relations with Lund. The evidence of Elwell and Evans is that they applied to Lund for a loan. Lund denies this; but the question is not whether the evidence was conflicting, but whether there was evidence to justify the jury in reaching a certain conclusion. The negotiations between Evans and Roth Bros. were for the purchase of the goods by Elwell. Roth Bros. gave the option to them, and knew nothing of Lund until the time came to close the transaction. Roth was then informed that certain arrangements had been made with Lund, and that the bill of sale would run to Lund, who had advanced the money for the purpose of making a part of the payment. Roth understood that the sale was made to Elwell. Elwell paid $20,000 of the consideration by the giving of secured notes, which were accepted as cash by Roth Bros.

There was evidence that at the first interview Lund asked that nothing be said in the presence of Wagner with reference to the bonus, which it was proposed should be paid. Lund was represented by counsel, who also prepared certain papers which passed between Elwell and Roth Bros. which recited a sale to Elwell. When it came to close the transaction, the bill of sale was made for the property from Roth Bros. to Lund, and Lund and Elwell signed what has been referred to as "Exhibit B," which is in the following terms:

This agreement, made and entered into by and between J. G. Lund, party of the first part, and J. F. Elwell, parties of the second part:

Whereas, the said party of the first part has this day purchased of Theo. J. Roth and A. A. Roth, copartners as Roth Bros., county of Douglas, state of Wisconsin, all of the goods, merchandise, fixtures, horses, and delivery service, together with a certain barn and the real estate upon which it is located, upon lots 24 and 25, in block 6, of Oak Lake addition to Minneapolis, the whole of which is more fully described in a certain bill of sale made by said Roth Bros. to J. G. Lund, dated February 14, 1906.

And, whereas, all of the personal and real property therein described is to be placed on sale, the sale to be conducted by the second parties, and the expense of selling, such as advertising, clerk hire, and such legitimate expenses, are to be paid from the proceeds of each day's sale, and at the end of thirty days or before the said party of the first part agrees to resell to the second parties all of the property, both real and personal, for the sum of $65,203.20, this amount to be collected from net proceeds of the daily sales until such $65,203.20 shall have been received by the said first party. The said first party to have absolute charge of the store, and shall be in charge of the collections, both cash and C. O. D., and all money is to be handled exclusively by the said first party or his representatives.

No goods shall be sold in the store at less than the invoice cost price, unless the same shall be agreed to by the first party. No extensive advertising shall be contracted at the liability

of the first party, unless agreed to by the first party. The conduct and sale of the merchandise, and all other goods, both real and personal, shall be in the absolute charge of the first party, and at the end of the thirty days this option to purchase by the second party shall absolutely terminate, said second party to assume all liabilities as assumed by J. G. Lund in the purchase.                                                                      J. G. Lund.

                                                                                   J. F. Elwell.

Lund went into actual possession of all the property under the bill of sale and this agreement with Elwell. Elwell acted as his manager without salary, although by subsequent agreement he was permitted to draw a small sum each week for living expenses. A representative of Lund acted as cashier of the business and received and disbursed the cash. New goods were purchased by Elwell and another representative of Lund upon the credit of Lund and added to the stock for the purpose of "sweetening" the same and making it more salable. The proceeds of sales were placed to the credit of Lund and were thereafter controlled by him. It became apparent that the proceeds of the sales would not be sufficient to reimburse Lund within the time contemplated by Exhibit B, and Elwell was given several extensions of time within which to see that Lund was reimbursed and to take over the stock. Controversies between the parties arose, and Elwell was finally discharged and excluded from further participation in the business.

Thereafter he brought this action to recover possession of what remained of the stock which had been originally turned over to Lund by Roth Bros., and alleged that the transaction was a loan of money for a usurious consideration and void under the statute. The contract known as "Exhibit B" was pleaded in the complaint in general terms, but it was not specially alleged that it was made as a cover for usury. Taking the pleading as a whole, however, we think that this is its force and effect, and so construe it. It is distinctly alleged that the transaction was a loan of money, and that the $10,000 was paid for the use of the money under a usurious agreement. It is true that there can be no usury unless the relation of debtor and creditor exists between the parties, with an obligation on the part of the debtor to repay the

debt. If the evidence of Elwell and Evans was true, as the jury evidently believed, the relation of debtor and creditor did exist between Elwell and Lund; and, if the contract was valid, an obligation rested upon Elwell to repay the debt, regardless of his testimony that he did not consider himself personally liable. The liability grew out of the transaction between the parties. If no loan was made, of course, there was no personal liability; but this begs the question. The relation of lender and borrower being established by the evidence, the liability of the borrower is implied as a matter of law.

The defendant's contention is that, whatever may have been the arrangement between Elwell and Roth Bros. and the nature of the application originally made to Lund, the transaction as finally consummated amounted to a sale of the property directly to Lund, and that this is conclusively shown by the bill of sale and Exhibit B. If this is true, it disposes of the case; but the contention rests upon the testimony of certain witnesses and the probative value to be given to the writings themselves. As already stated, where there is conflicting evidence, usury is a question of fact for the jury; and we think the evidence was amply sufficient to require the issue to be submitted to the jury and to sustain the verdict as returned. Notwithstanding some decisions to the contrary, we hold that the doctrine of waiver has no application in a case of this character, where the rights of no third parties are involved. Circumstances may conceivably arise which would justify the application of the doctrine of estoppel. The usury laws of this state are very specific and very stringent, and impose a severe penalty upon a party who violated their provisions. It is difficult to understand how a borrower, who, in order to obtain a loan, agrees to pay a usurious consideration therefor, can do anything thereafter which would amount to a waiver of his right to assert the fact of the usurious nature of the transaction. There can be no conduct which would more strongly import a waiver than the making of the loan, the execution of the security, and the acceptance of the money. Parties who loan money in violation of this statute must take the chance that the borrower may repudiate his agreement. The statute makes the contract void, and in effect imposes a penalty upon the person who loans money in violation of its terms. It in effect invites

the borrower to repudiate his apparent obligation. There is certainly nothing in this record upon which to base an estoppel, as Lund was not induced by any act of Elwell to change the position in which he placed himself under the original agreement. Scott v. Austin, 36 Minn. 460, 466, 32 N. W. 89, 864. No effort is made to recover the goods purchased by Lund after he went into possession of the store.

The evidence of conversations between Elwell and Roth with reference to the proposed purchase of the stock by Elwell was, under the circumstances, properly received. The entire transaction was under investigation. The statements made by Elwell to Roth did not bind Lund; but the nature of the original negotiations for the purchase of the stock was material, as throwing light on the character of the agreement which was finally entered into.

The appeal of Elwell from that part of the order which reduced the verdict is without merit.

The order of the trial court is affirmed on both appeals.

On September 20, 1907, the following opinion was filed:

PER CURIAM.

Our attention has been called to the fact that the statement in the opinion in reference to the claim of counsel for appellant as to the conclusiveness of Exhibit B is liable to be understood as imputing to them erroneous views as to the law of usury. We therefore deem it just to counsel to state that the claim which they made on the hearing of the appeal was to the effect following: No claim is made that an agreement, fair and valid on its face, cannot be attacked for usury if it be subject to that charge. When, however, a formal contract in writing is attacked, the burden is on the attacking party to show that it was intended as a device or shift to conceal the real contract. There is no substantial evidence in the record tending to show any agreement or understanding, oral or otherwise, between the parties, other than as shown by the written contract, Exhibit B. Therefore it is conclusive of the contract of the parties.